Kevin D. McCullough
State Bar No. 00788005
Kathryn G. Reid
State Bar No. 24068126
Shannon S. Thomas
State Bar No. 24088442
ROCHELLE McCULLOUGH, LLP
325 N. St. Paul Street, Suite 4500
Dallas, Texas 75201
Telephone: 214-953-0182
Facsimile: 214-953-0185
kdm@romclaw.com
kreid@romclaw.com
sthomas@romclaw.com

SPECIAL LITIGATION COUNSEL FOR
ROBERT YAQUINTO, JR., CHAPTER 7 TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 18-32123-SGJ-7 |
| JRJR33, INC., and | § | CASE NO. 18-32124-SGJ-7 |
| THE LONGABERGER COMPANY | § | |
| | § | Jointly Administered Under |
| Debtors. | § | Case No. 18-32123-SGJ-7 |

| | | |
|---|---|---|
| ROBERT YAQUINTO, JR., CHAPTER 7 TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADV. CASE NO. 20-_____ |
| v. | § | |
| | § | |
| JOHN P. ROCHON, JOHN ROCHON, JR., HEIDI ROCHON HAFER, R-NINE NINE NINE, INC. f/k/a R-999, INC. f/k/a RICHMONT HOLDINGS, INC., MICHAEL BISHOP, and WILLIAM H. RANDALL, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## TRUSTEE'S ORIGINAL ADVERSARY COMPLAINT

**TO THE HONORABLE STACEY G.C. JERNIGAN,**
**UNITED STATES BANKRUPTCY JUDGE:**

NOW COMES, Plaintiff Robert Yaquinto, Jr., Chapter 7 Trustee of the above-referenced

Debtors (the "Trustee"), and files this *Original Adversary Complaint* against certain former

officers and directors of JRjr33, Inc. ("JRjr33") and The Longaberger Company[1] ("TLC," and

collectively with JRjr33, the "Company" or the "Debtors"), and in support thereof respectfully

states as follows:

## I.     SUMMARY OF TRUSTEE'S CLAIMS

1.     Through self-dealing, incompetence, and gross mismanagement, John P. Rochon,

with the assistance of his children, pillaged and decimated more than a dozen companies under

his control.  Exorbitant insider management fees and expenses destroyed any significant asset

value of the Debtors and their affiliates.  Included in this list of corporate casualties is the once

highly regarded Longaberger Company which, at its peak, employed over 8,000 employees and

had over $1 billion in annual revenues.  Aided by a hand-picked and ineffectual board, the

Rochon Defendants failed to protect the value of the Debtors' sizable assets causing significant

financial injury to the Company and its creditors and stakeholders.  The Board of Directors were

incapable of making informed Company decisions due to the failure to implement and maintain

even the most basic and rudimentary internal financial controls and procedures.  A revolving

door of auditors and CFOs were the canary in the coal mine that went largely ignored by this

conflicted and inattentive board, which turned a blind eye to the blatant malfeasance.  Whatever

John R. Rochon ordered was followed largely without question or meaningful resistance.  Such

---

[1] TLC is a wholly-owned subsidiary of JRjr33.

negligence, waste, inaction, and breach of fiduciary duty and loyalty form the basis for this lawsuit.

## II.     JURISDICTION AND VENUE

2.      The Court has jurisdiction over this adversary proceeding because it involves a core matter for the causes of action set forth herein, pursuant to 28 U.S.C. §§ 157 and 1334.

3.      Venue for the bankruptcy case and this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to 28 U.S.C. § 1391, venue is also appropriate as Defendants are authorized to and regularly carry out substantial business in this district and the acts and conduct complained of herein took place within this district. Accordingly, this Court also has personal jurisdiction over Defendants.

## III.     PARTIES

4.      Plaintiff Robert Yaquinto, Jr. is the duly appointed Chapter 7 Trustee in the underlying bankruptcy cases of *In re JRjr33, Inc.* and *In re The Longaberger Company*, jointly administered under Case No. 18-32123-SGJ-7.  The Trustee is a legal entity separate and distinct from the Debtors, and institutes these claims on behalf of their bankruptcy estates and for the benefit of their creditors.

5.      Defendant John P. Rochon ("Rochon") is the Company's former Chief Executive Officer, President and Chairman of the Board and may be served with process at the place where he regularly conducts a business or profession at Richmont Capital Partners V LP, 2400 N. Dallas Parkway, Suite 230, Plano, Texas 75093 or 2950 N. Harwood Street, Suite 2200, Dallas, Texas 75201. Rochon can also be served at his home address located at 17631 Cedar Creek Canyon Drive, Dallas, Texas 75252.

6.     Defendant John Rochon, Jr., ("Rochon, Jr.") is the Company's former Director, Vice Chairman, Chief Financial Officer and Treasurer and may be served with process at the place where he regularly conducts a business or profession at Richmont Capital Partners V LP, 2400 N. Dallas Parkway, Suite 230, Plano, Texas 75093 or 2950 N. Harwood Street, Suite 2200, Dallas, Texas 75201. Rochon, Jr. can also be served at his home address located at 6307 Waggoner Drive, Dallas, Texas 75230.

7.     Defendant Heidi Rochon Hafer ("Hafer") is the Company's former Secretary and General Counsel and may be served with process at the place where she regularly conducts a business or profession at Richmont Capital Partners V LP, 2400 N. Dallas Parkway, Suite 230, Plano, Texas 75093 or 2950 N. Harwood Street, Suite 2200, Dallas, Texas 75201.  Hafer can also be served at her home address located at 3707 Gilbert Avenue, Apartment 10, Dallas, Texas 75219.

8.     Defendant R-Nine Nine Nine, Inc. f/k/a R-999, Inc. f/k/a Richmont Holdings, Inc. ("Richmont Holdings")[2], a Texas for-profit corporation is the Company's former management company.  Richmont Holdings is 100% owned by Rochon, who also serves as its President. Rochon, Jr. has served as the Vice Chairman and Chief Executive Officer of Richmont Holdings since 2006.  Richmont Holdings may be served with process through its registered agent, Heidi Rochon Hafer at 2400 Dallas Parkway, Suite 230, Plano, Texas 75093.

9.     Defendant Michael Bishop ("Bishop") is a former Director on the Company's Board of Directors (the "Board") and may be served with process at the place where he is

---

[2] Richmont Holdings filed a Chapter 7 bankruptcy case in the Bankruptcy Court for the Eastern District of Texas on June 4, 2018, shortly before JRjr33 and TLC filed their cases in the Northern District.  The Richmont Holdings case, styled *In re R-Nine Nine Nine, Inc.*, Bankr. E.D. Tex. 18-41178, was closed as a no-asset case on February 5, 2019. Richmont Holdings remains an active business registered with the Texas Secretary of State according to its most recent Public Information Report filed on December 31, 2019.

currently incarcerated at Texas Department of Criminal Justice, Joe F. Gurney unit, 1385 FM 3328, Palestine, Texas 75803, Ref: TDCJ Number 02237957.

10.     Defendant William H. Randall ("Randall) is a former Director on the Company's Board and may be served with process at his home located at 5591 Wendover Drive, Frisco, Texas 75034.

11.     Rochon, Rochon, Jr. and Hafer are collectively referred to herein as the "Rochon Defendants."  Rochon, Rochon, Jr., Hafer, Bishop and Randall are collectively referred to herein as the "Individual Defendants."

## IV.     RELATED PARTIES

12.     Rochon created and controls a web of related entities. The complexity and convolution of these corporate relationships has enabled him to repeatedly manipulate the corporate form to his own advantage, at the tremendous disadvantage of the entities and, in this case, the Debtors' shareholders and creditors.

13.     Rochon Capital Partners, Ltd. ("Rochon Capital") holds itself out as an investment management company. Rochon Capital is 79% owned by Rochon, 20% by his wife, and 1% by the general partner, John Rochon Management, Inc. ("JRMI").  Rochon is the President and sole shareholder of JRMI.  On October 18, 2017, Rochon Capital entered into an agreement with JRjr33 guaranteeing to fund its operations through October 31, 2018.  As evidenced by the Debtors' bankruptcy filings in June 2018, Rochon Capital did not live up to its end of the bargain.

14.     Richmont Capital Partners V LP ("RCP V") is identified as a private equity investment arm of Richmont Holdings. RCP V is also controlled by Defendant John Rochon through its managing general partner, Richmont Street, LLC.  Defendant John Rochon, Jr.

currently serves as Chairman and Chief Executive Officer of RCP V, while Defendant Heidi Hafer serves as the company's General Counsel.

## V. PROCEDURAL BACKGROUND

15. On June 29, 2018 (the "Petition Date"), JRjr33, Inc. and The Longaberger Company filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").

16. On September 14, 2018, the Bankruptcy Court entered an order granting joint administration of the Debtors' bankruptcy cases (as jointly administered, the "Bankruptcy Case").

17. Thereafter, both the United States Trustee and a (purportedly) secured creditor, JGB Collateral, LLC, petitioned the Court to convert the Bankruptcy Case to Chapter 7 on the basis that neither of the Debtors had cash, operations or employees, and therefore had no reasonable likelihood of reorganization. These motions were resolved by agreement of the parties, and the Bankruptcy Case was converted to a chapter 7 proceeding on October 26, 2018. Robert Yaquinto, Jr. was appointed as the chapter 7 trustee.

## VI. FACTUAL BACKGROUND

### A. The Beginning of the Rochon Family Direct-Sales Empire.

18. JRjr33's origins begin with the incorporation of Cardio Vascular Medical Device, Inc. in Delaware in April 2007, a publicly traded business engaged in the development and commercialization of medical devices. Then, a transformation started in June 2011 with a name change to Computer Vision Systems Laboratories, Corp. ("CVSL") and conversion to a Florida

corporation.[3] The following year, CVSL entered into a Share Exchange Agreement with Happenings Communications Group, Inc. ("HCG") and Rochon Capital whereby HCG became CVSL's wholly owned subsidiary in consideration for Rochon Capital receiving 90% of CVSL's issued and outstanding stock.

19. HCG was in the business of publishing a monthly magazine, but that was not the business segment that the Individual Defendants were after. Instead, their plan was to scale up quickly by acquiring direct-selling businesses. Rochon had a storied pedigree in that industry, having risen to the rank of Chairman and CEO of Mary Kay, Inc.

20. The reverse merger orchestrated by the Rochon Defendants was attractive for several reasons. The public company, CVSL, had greater access to capital markets and the option of issuing additional stock through secondary offerings. It also provided more strategic options to pursue acquisition targets using company stock as currency. So, the stage was set for the Rochon Defendants to pursue their rapid growth strategy through the acquisition of direct-selling companies.

**B. JRjr33 Scaled Up Quickly with Hasty Acquisitions, but the Integration of Operations Across the Enterprise Was Disastrous.**

**i. Direct-Selling Acquisitions.**

21. JRjr33 commenced operations in the direct selling business in March 2013, with the acquisition of a controlling interest in TLC, a seller of premium hand-crafted baskets made in Ohio and a line of home products, including pottery, cookware, wrought iron and other home décor products, through a nationwide network of independent sales representatives. TLC had been started decades earlier as a small family business selling baskets made locally by skilled basket weavers in Dresden, Ohio. The TLC product line was well-suited to the direct-sales

---

[3] CVSL is the JRjr33's former name. On February 1, 2016, a majority of the Company's voting stock approved an amendment to the company's Articles of Incorporation, thereby changing the company name to JRjr33, Inc.

model, and after a sustained period of steady growth, the company moved its headquarters to the iconic Longaberger Basket building (the "Big Basket") in Newark, Ohio in 1997:



22.     In the acquisition, JRjr33 obtained 51.7% of all issued and outstanding TLC stock. As consideration, JRjr33 issued a Convertible Subordinated Unsecured Promissory Note, dated March 15, 2013, in the original principal amount of $6,500,000 to a trust in the name Tamala Longaberger, one of the daughters of TLC's founder, Dave Longaberger. This note was later converted to 32,500,000 shares of JRjr33's Common Stock. To TLC, JRjr33 issued a ten-year, $4,000,000 unsecured promissory note, dated March 14, 2013, payable in monthly installments.

23.     After TLC, JRjr33 acquired six more direct-selling companies in 2013 and 2014 in quick succession.

24.     In August 2013, JRjr33 acquired substantially all of the assets of Your Inspiration At Home Pty Ltd. ("YIAH"). YIAH was a direct seller of hand-crafted spices from around the

world. YIAH originated in Australia and expanded its operations to North America in 2013. JRjr33 acquired substantially all the assets of YIAH in exchange for total consideration of 4,512,975 shares of its Common Stock and the assumption of certain liabilities of YIAH.

25.     In October 2013, JRjr33 formed Agel Enterprises, Inc. ("AEI") which acquired substantially all of the assets of Agel Enterprises, LLC ("Agel"). Agel was a direct selling business based in Springville, Utah that sold nutritional supplements and skin care products through a worldwide network of independent sales representatives in over 40 countries. AEI acquired substantially all the assets of Agel in exchange for total consideration of 7,446,600 shares of JRjr33's Common Stock, the delivery of a Purchase Money Note in the original principal amount of $1,700,000 and the assumption of certain liabilities of Agel. 572,549 of the common shares for this acquisition were issued in January 2014.

26.     Also in October 2013, JRjr33 acquired substantially all of the assets of Tomboy Tools, Inc. ("TBT"), a direct seller of a line of tools designed for women as well as home security monitoring services. The consideration for this acquisition was 1,766,979 shares of JRjr33's Common Stock and the assumption of liabilities of $471,477.

27.     In December 2013, JRjr33 acquired substantially all of the assets of Paperly, LLC ("Paperly"), a direct seller whose independent sales consultants worked with customers to design and create custom stationery through home parties, events and individual appointments. The total consideration for this acquisition was 155,926 shares of JRjr33's Common Stock and payment of an earn out of 10% of EBITDA from 2014 to 2016. The Common Stock for this acquisition was issued in 2014. JRjr33 also assumed liabilities of $110,022 in connection with Paperly's acquisition.

28.     In December 2013, JRjr33 also formed CVSL A.G., a Switzerland company, which acquired a 90% controlling interest in My Secret Kitchen Ltd. ("MSK"), an award-winning UK-based direct seller of a unique line of food products. JRjr33 acquired substantially all of the stock of MSK in exchange for total consideration of 15,891 shares of the Company's Common Stock and payment of an earn-out of 5% of MSK's EBITDA from 2014 to 2016.

29.     In March 2014, JRjr33 acquired substantially all of the assets of Uppercase Living, LLC ("Uppercase Living"), a direct seller of customizable vinyl expressions for display on walls. Consideration consisted of 578,387 shares of JRjr33's Common Stock and payment of an earn out equal to 10% of the EBITDA of the subsidiary that acquired the assets for the years ended December 31, 2014, 2015 and 2016 payable in cash or common shares at JRjr33's discretion.

30.     JRjr33 made its last two acquisitions, its two largest after TLC, in 2015.

31.     On March 24, 2015, JRjr33 purchased one of the original home shopping businesses in the UK, Kleeneze Limited ("Kleeneze"). Founded in 1923, Kleeneze started as a home solution provider, and later expanded its product line to include health and beauty, electrical, housewares, Christmas, toys, gifts, garden, and personalized gifts. Kleeneze operated in the UK and Ireland. Total consideration for this deal was $5.1 million, which consisted of $3.0 million of senior secured debt provided by HSBC Bank PLC. The remaining $2.1 million of consideration consisted of cash, but approximately $1.9 million in cash was acquired by JRjr33 as part of the transaction at closing.

32.     On October 15, 2015, JRjr33 closed its last deal with the acquisition of Betterware Ltd. ("Betterware"), another UK business. This deal was made through JRjr33's wholly owned Swiss subsidiary, CVSL A.G., which acquired Betterware's parent company.

Betterware was founded in 1928 and was best known for its housewares and home cleaning products, but had expanded its offerings to include gifts, personal care, mobility and beauty, as well as outdoor and electrical products. Total consideration for the Betterware acquisition was approximately $9 million, made up of $1.5 million in cash (funded by cash acquired by the Company at closing), a $5.8 million convertible note, and 976,184 in Company shares.

### ii. Individual Defendants' Integration of Acquired Businesses and Management of the Company – or Lack Thereof.

33.     From the Company's inception, the Individual Defendants held themselves out as experienced professionals in business integration, particularly in the areas of finance, accounting, treasury, technology and supply chain. This was key for the Company's success because the businesses that the Individual Defendants targeted for acquisition were troubled or under-performing. The acquired businesses also lacked adequate financial and operational staffing to meet public company financial reporting standards. It quickly became clear, however, that the Individual Defendants were not skilled turnaround professionals.

34.     The Individual Defendants were indeed proficient at spending money, just not on the kinds of things that added shareholder value. The references to the Individual Defendants and their contributions to the Company as found in the Company's SEC filings and investor materials are mostly generic business buzzwords, like "finding efficiencies," "spotting opportunities for top line growth," and "efficiencies by eliminating duplication of efforts and costs." Unfortunately, there is no substance to these hollow descriptions, and the Company's operational "infrastructure," as touted by the Individual Defendants, was virtually nonexistent.

35.     The Company engaged its affiliated company, Richmont Holdings, under a Reimbursement of Services Agreement. Richmont Holdings was described as a private investment and business management company with expertise in mergers and acquisitions,

including financing, due diligence, negotiations and other strategic planning, accounting, tax and legal matters. Under the Reimbursement of Services Agreement, JRjr33 would fund the "M&A team and costs associated with supporting their efforts." As explained below, what that really means is that JRjr33 had the privilege of paying for the Rochon Defendants' extravagant travel and personal expenses, including private jets, four-star hotels, and a fleet of Maseratis.

36. The Individual Defendants justified paying Richmont Holdings millions of dollars every year, including a $160,000 per month "management fee" and reimbursement of millions in M&A-related expenses, because, in their assessment, JRjr33 needed "advice and assistance in areas related to identification, analysis, financing, due diligence, negotiations and other strategic planning, accounting, tax and legal matters associated with [] potential acquisitions." But even after years of this so-called "advice and assistance" from Richmont Holdings, JRjr33 was plagued by material weaknesses in its financial and compliance controls, including: (i) failure to hire competent accounting personnel to resolve complex accounting issues, and institute an adequate plan over the segregation of cash controls; (ii) inadequate due diligence and risk assessment of target businesses from pre-acquisition evaluation to the post-acquisition consolidation and integration of operations; (iii) inadequate reconciliation, review and approval processes for the creation of the Company's financial statements, including for all adjusting journal entries; (iv) failure to account for inventory; (v) failure to institute a control mechanism in order to maintain the appropriate segregation of duties among accounting and finance personnel; and (vi) inadequate controls to ensure that acquired businesses are integrated with the Company's enterprise resource planning (ERP) system.

37. It is also worth noting that, in 2016 alone, JRjr33 paid $2,365,000 in M&A expenses to Richmont Holdings, despite there being no acquisitions by the Company after 2015.

38.     In reality, Richmont Holdings was not providing value to the Company, it was sucking it dry. The only reason Richmont Holdings was paid was because it was owned and operated by Rochon and Rochon, Jr. and they were the ones directly benefitting from those payments.

39.     These deficiencies are troubling, but what is more so is that they are the result of material weaknesses in the Company's operational and compliance program that had been identified years earlier but had been largely ignored by the Defendants, despite the recommendations from a revolving door of CFOs and reputable public audit firms.

40.     Plus, these operational failures had serious consequences beyond the exorbitant and unjustified amount of cash paid to Richmont Holdings. JRjr33 was forced to cancel its registered offering in November 2014. Then the following year, JRjr33 missed the SEC filing deadline for the Form 10-K for the fiscal quarter ended June 30, 2015, because "the Company was unable to compile certain information required in order to permit the Company to file a timely and accurate report on the Company's financial condition." JRjr33's delinquent filings became a chronic problem in 2016 as well, which meant that the Company was in violation of debt covenants with its lender, was prohibited from raising capital through issuance of public securities, and was at risk of deregistration by the SEC and delisting by stock exchanges.

**C.  Individual Defendants' Fiduciary Duties to the Company.**

41.     By reason of their positions as officers and directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders and creditors fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. Each Individual Defendant

owed the Company the fiduciary duty to exercise good faith and diligence in the administration of the business and in the use and preservation of its property and assets and the highest obligations of fair dealing.

42. Defendant Randall was lead director and Chairman of the Audit Committee and Chairman of the Compensation Committee. He was an "audit committee financial expert" as that term is defined under Item 407 of Regulation S-K. As an alleged independent director, Defendant Randall took no significant action to inquire into, investigate, or restrain the wrongful acts of the Board and specifically the Rochon Defendants. The Audit Committee and Compensation Committee, both chaired by Defendant Randall, were mere puppets of the Rochon Defendants as shown from their absolute lack of informed or meaningful meetings and the Board's subsequent rubber stamping of all recommendations or directives of the Rochon Defendants. Defendant Randall thoroughly failed to exert even the minimum acceptable proficiency or independence required for a member of a publicly held company's board of directors and thus violated his duty of care and loyalty to the shareholders and creditors of the Company.

43. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

44. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on the NASDAQ, the Individual Defendants had a duty not to effect, and to prevent, the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to be transparent and accurate in its regulatory filings with the SEC.

45.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

      a.  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with state, federal, and international laws, and pursuant to the Company's own Code of Business Conduct and Ethics and internal guidelines;

      b.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      d.  establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically

investigate, or cause independent investigation to be made of, said reports and records;

e.  maintain and implement an adequate and functioning system of internal legal, financial, accounting and management controls, such that the Company's operations would comply with all laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders and creditors would be accurate;

f.  refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

g.  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

h.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's value.

46.     Each of the Individual Defendants further owed to the Company a duty of loyalty requiring that each favor the Company's interest and that of its shareholders and creditors over their own while conducting the affairs of the Company, and to refrain from using their position, influence or knowledge of the affairs of the Company to gain a personal advantage.

47.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were acting within the course and scope of such agency.

48.     Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

**D. Payments to Richmont Holdings Unlawfully Enriched the Rochon Defendants.**

49.     Rochon was the CEO of the Company, but did not draw a salary. Instead, his wholly owned consulting company, Richmont Holdings, was paid generous management fees and reimbursed extravagant expenses. This included reimbursements for luxurious travel and personal expenses, including expenditures unrelated to company business. In 2014 alone, the Rochon Defendants expensed $122,578.47 for their family fleet of Maseratis, $841,489.82 in legal fees to defend litigation against Richmont Holdings and another affiliate, $115,289.81 in travel expenses, including private jet travel to Napa Valley, Destin, NY, New Orleans, Aruba, and first-class flights and hotel to Rome. In 2015, Jrjr33 paid another almost $119,000 in expenses related to Maseratis driven by the Rochon Defendants.

50.     SEC filings indicate that, in addition to receiving services from Richmont Holdings related to potential acquisitions, the Company also utilized "certain of [Richmont Holdings'] personnel, financial analysis personnel, strategy assistance, marketing advice, taxation advice, and assorted other services related to day-to-day operations and the efforts to acquire and manage direct-to-consumer-companies." These additional services are not provided for in the Reimbursement of Services Agreement between the Company and Richmont Holdings, and while the Company's SEC filings indicate that "the Company has entered into an agreement

with Richmont Holdings to reimburse Richmont Holdings" for these expenses, the Trustee has not been provided with such agreement.

51.     By virtue of its overlapping management, directors and officers, Richmont Holdings was able to effectively control the Company.  The mutual directors and officers of the respective companies included the Rochon Defendants: John P. Rochon (Founder, President and Chairman of the Board of Directors of Richmont Holdings, and CEO, President and Chairman of the Board of Directors of JRjr33); John P. Rochon, Jr. (CEO and Vice Chairman of the Board of Directors of Richmont Holdings, and CFO, Treasurer, Director and Vice Chairman of the Board of Directors of JRjr33); and Heidi Rochon Hafer (Corporate Secretary of Richmont Holdings, and Corporate Secretary and General Counsel of JRjr33).

52.     Payments through Richmont Holdings to the Rochon Defendants were expensed in different ways on the Company's financials, and labeled either "M&A Expenses," "M&A Infrastructure Expenses," or "General and administrative expense" on the Company's consolidated statements of operations.  These payments totaled millions every year.  For M&A-related activities, the Company paid $3,236,000 in 2014, $2,681,000 in 2015, and in 2016, a year were no acquisitions were consummated, there were expenses totaling $2,365,000.  Under the "General and administrative expense" category, additional payments to Richmont Holdings were at least $1.9 million in 2014, $2.2 million in 2015, and $1.9 million in 2016.

53.     The Company's 2017 financials are a bit hazy since no 10-K or 10-Qs were filed for 2017, but a forensic analysis of the Company's bank records reveals that $271,112.11 in additional transfers were made directly to Rochon, and in the year prior to the Petition Date, $1,538,250.15 was transferred to Richmont Holdings, as itemized in Exhibit A, attached hereto and incorporated herein by reference.  A total of $2,883,067.36 was transferred to Richmont

Holding within two years of the Petition Date, as itemized in Exhibit B, attached hereto and incorporated herein by reference.

54.     Rochon, Jr. also benefited from these payments to Richmont Holdings in addition to his generous salary as the Company's Vice Chairman and periodic CFO.   With an undergraduate business degree and a decade of experience running the Rochon family office, his credentials made him an unlikely candidate for the CFO position of a public company with operations in 50 countries and over $100 million in gross annual revenues, but he stepped into the role for the first time on March 16, 2015 upon the resignation of the prior CFO.  He was again appointed CFO when the Company's fourth CFO, in just as many years, resigned in May 2017.

55.     For other companies, perhaps it is not necessary for the CFO to be a CPA or have technical accounting expertise, but this Company was different.  It was dealing with significant compliance failures, cross-border operational integration, and tax and accounting issues with distressed subsidiaries that were engaged in commerce in multiple countries around the globe, including corruption hot spots.  In this case, it was necessary for the Company to hire a seasoned expert to deal with these issues.  The problem was, every time they tried that, the CFO brought in from the outside would try mightily to right the ship, but would ultimately fail and bail out because of the lopsided power dynamics in favor of the Rochon Defendants and their practices of personal enrichment.  In just over a year period, from 2016 to 2017, the Company went through two CFOs in quick succession before the position landed back with Defendant John Rochon, Jr.

56.     The Rochon Defendants' dual roles with the Company and Richmont Holdings presented a serious conflict of interest in violation of the Company's own Code of Business Conduct and Ethics, which states:

All of our officers, directors, and employees have a responsibility to understand and follow this Code…
…

You must avoid any personal activity, investment, or relationship that could reasonably appear to interfere with, good judgment concerning the Company's best interests. You may not exploit your position or relationship with the Company for personal gain. You should avoid even the appearance of a conflict.

57.    The Rochon Defendants conducted themselves in a manner that revealed their complete and utter contempt for the ethical boundaries that governed the rest of the Company. There was also no effective mechanism by which to enforce the rules against the Rochon Defendants, who carried on as if the rules did not apply, because a majority of the Board was not independent.   Moreover, because the Company lacked the internal controls and oversight necessary to present the Company's independent board members with all of the information, analysis, and advice by which to fully and fairly review the Rochon Defendants' self-interested transactions and payments, the Board's approval of the Rochon Defendants' conduct does not serve to ratify those actions.

58.    Ultimately, the Rochon Defendants' willful ignorance of the responsibilities they took on as officers and fiduciaries of the Company, their failure to institute internal controls and oversight procedures, and their self-dealing via Richmont Holdings caused the Company to fail.

**E.  The Company Loses the Big Basket Through Foreclosure and Declares War Against Tami Longaberger.**

    **i.    The "Big Basket" Foreclosure**

59.    The "Big Basket" Building in Newark, OH, served not only as TLC's headquarters for nearly two decades, but as a quirky and beloved symbol of the company, recognized nationwide by its devoted followers. This iconic symbol, a valuable piece of real

estate in TLC's portfolio, also fell victim to the corporate malfeasance of the Individual Defendants.

60. On March 31, 2017, the Licking County, Ohio Treasurer filed a complaint for foreclosure against TLC in the Common Pleas Court of Licking County, Ohio. Case No. 17CV0387. The Complaint was an action in foreclosure to collect more than $700k in overdue real estate taxes, interest and penalties owing against the "Big Basket" property, which had served as TLC's headquarters since 1997.[4]

61. The lawsuit resulted from the failure of a Tax Increment Financing Agreement ("TIF") executed in 1996 between the City of Newark, Ohio and TLC, and the Individual Defendants' subsequent decision to stop paying taxes on the building at the end of 2014.

62. On May 1, 1996, prior to and in anticipation of the completion of the "Big Basket," TLC entered into a TIF with the City of Newark, pursuant to which TLC would make semi-annual service payments to the city in lieu of property taxes. Such service payments were to be determined semi-annually based on the valuation of the property at that time, and the payments were to continue for a period of 30 years. Pursuant to the TIF, the City of Newark issued general obligation municipal bonds to fund certain infrastructure improvements on and around the "Big Basket" property. The semi-annual service payments were intended to serve as a revenue source to service the bonds.

63. In 2007, TLC sought a re-assessment of the tax value of the property, such that the new value would have dramatically reduced the amount paid by the company as semi-annual service payments, resulting in an amount insufficient to fully service the bonds. To address this

---

[4] In addition to the Longaberger Company, the complaint named five additional defendants, each whom was alleged to potentially have an interest in the property, although the extent of such interest was unknown – State of Ohio Department of Taxation, City of Newark, Ohio Department of Taxation, R. Dorsey + Company, Inc, American Colorscans, Inc. and United Refrigeration, Inc.

insufficiency, TLC entered into a "Gap Agreement" with the city of Newark, dated April 7, 2007, pursuant to which TLC would make payments directly to the city in an amount to be determined semi-annually, based on the difference between the semi-annual service payments and the debt service paid by the city on the previously issued bonds, as calculated according to a formula set forth in the Gap Agreement. As consideration for the supplemental payments under the Gap Agreement, the city reissued the bonds. The Gap Agreement provided that the obligations therein were inextricably tied to the service payments in lieu of property taxes created by the TIF.

64. After performing under the Gap Agreement for several years, TLC stopped making payments to the city altogether, the last payment having been made in December 2012. It can be of no coincidence that the next payment would have come due after management of TLC was transferred to the Individual Defendants. Because TLC was no longer performing under the TIF or Gap Agreement, property taxes began to accrue on the "Big Basket" property. Under the direction of the Individual Defendants, the company also stopped making payments on the property taxes at the end of 2014.

65. These intentional defaults resulted in a total amount owed to the City of Newark under the Gap Agreement of $285,825.00 and a delinquent tax liability of $715,418.73 owed to Licking County, Ohio. Named as a co-defendant in the lawsuit, the City of Newark Department of Taxation filed a cross-claim against TLC for the amounts owed under the Gap Agreement.

66. The Individual Defendants did not even attempt to defend TLC against these claims. While it filed an answer to both the original complaint and the counter-claim, both amounted to little more than admittance or denial of the allegations in the respective complaints. In the cross-claim, TLC made the additional argument that "[t]he City is in breach of the terms of

the Gap Agreement in that City has failed to provide Longaberger with the notices required by Section 2 of the GAP Agreement."

67.     Both the Plaintiff, Licking County Treasurer, and Cross-Claimant, City of Newark, Ohio Department of Taxation, filed motions for summary judgment, to which The Longaberger Company did not respond. Not surprisingly, these motions were summarily granted by the Court, resulting in a judgment lien in favor of Licking County for $715,418.73 in overdue taxes, penalties and interest, and a judgment lien in favor of the City of Newark, Ohio for $285,825.00. The "Big Basket" was ordered to be foreclosed upon.

68.     That the Individual Defendants violated the tenets of corporate due diligence and responsibility in completely disregarding these tax obligations, resulting in the forfeiture of a valuable piece of real estate, is beyond dispute.

69.     Even prior to the foreclosure proceeding, Rochon, Jr., when asked about the real estate tax delinquency in September 2016, was quoted in a USA Today article as saying those tax bills were the responsibility of Tami Longaberger, TLC's former CEO.

> JRJR Networks is also responsible for $605,219 in delinquent property taxes on the seven-story, basket-shaped building it vacated in July. The company still owns the iconic structure, but has not paid any property taxes since November 2014. Rochon said those tax bills are the responsibility of Tami Longaberger, the former Longaberger CEO who left the company in the spring of 2015.
> **'I'm done paying her bills,' Rochon said. 'It's time for her to pay them.'**
> Asked when Newark and Licking County will be compensated, Rochon answered, **'When she pays it. I don't think I'd double pay it.'**[5]

70.     Such vitriol, at least in this instance, stemmed from an allegation by the Rochon Defendants that Tami Longaberger not only failed to disclose, but fraudulently hid, the existence of the TIF Agreement during negotiations for the purchase of The Longaberger Company in

---

[5]     Available at https://www.usatoday.com/story/news/local/2016/09/23/jrjr-sues-tami-longaberger-hiding-liabilities/90925026/ (emphasis added).

2013, resulting in a multi-million dollar liability that they were unaware of at the time of the acquisition.

### ii. The Tami Longaberger Lawsuits.

71.     The Company pursued retaliatory litigation against Tami Longaberger related to the "Big Basket" tax delinquency. In a lawsuit filed in Dallas County District Court against Tami Longaberger, individually and as Trustee of the Tamala L. Longaberger Revocable Trust, on September 22, 2016, JRjr33 alleged that "[o]n or about March 8, 2016, JRJR was informed that TLC had executed two agreements with [the] City of Newark, Ohio (the "City") which were not disclosed by Defendants." *See JRJR33, Inc. dba JRJR Networks v. Tamala Longaberger, Individually and as Trustee under the Tamala L. Longaberger Revocable Trust*, No. DC-16-12594, 191st District Court, Dallas County, Texas (the "Dallas County Litigation").

72.     Such failure to disclose, JRJR33, Inc. alleged, amounted to breach of contract, fraud, fraud by nondisclosure, fraud by misrepresentation, negligent misrepresentation, and breach of warranty. While it is undisputed that Tami Longaberger did not disclose the TIF Agreement or Gap Agreement in either the purchase agreement or the disclosure statement, whether or not such non-disclosure amounted to a civil offense was never determined, as the Dallas County case was stayed pending this bankruptcy.

73.     What is most concerning to the Trustee, however, is that the Rochon Defendants, as directors and officers of the Company, claimed to have not learned of the existence of these agreements until "on or about March 8, 2016." If that is in fact the case, these agreements and their attendant liabilities were an open secret.

74.     That the Rochon Defendants were unaware of the TIF Agreement is a clear indication that proper due diligence was not undertaken prior to JRjr33 entering into the purchase

agreement for TLC, which is particularly troubling considering the Company engaged and paid millions of dollars to their company, Richmont Holdings, every year specifically for their alleged expertise in, among other things, M&A due diligence. In Ohio, TIF Agreements are required to be filed with the auditor of the county in which the property is located. Had the Company undertaken a thorough review of the property records related to the Big Basket property, they would have discovered that there was a TIF Agreement on the property.

75.     Evidence of the TIF Agreement on the "Big Basket" property can be found on the Licking County Auditor's website.



76.     Even so, it is nonsensical to think that the Individual Defendants should not have become aware of the agreements for a full three years after the purchase of TLC. A search of TLC's server reveals multiple journal entries and tax payable spreadsheets which reference the its TIF obligation and accrued and overdue amounts related thereto. But for the carelessness of

---

[6]   This information was found by visiting the Licking County, Ohio Auditor's website at https://www.lickingcountyohio.us/ and performing a property search for Parcel No. 055-282708-00, which is the property identified in the foreclosure proceeding, located at 1500 E. Main Street, Newark, OH 43055.

the Individual Defendants, and by extension Richmont Holdings, JRjr33 would have been made aware of these liabilities, which could have been cured and the "Big Basket" Foreclosure avoided.

77.    The Dallas County Litigation is just one of three separate disputes JRjr33 found itself embroiled in with Tami Longaberger after her departure from the company in 2015.[7] These legal matters sucked time, money, and resources from the Company, and served as a major distraction.  The airing of grievances against Tami Longaberger in public forums also harmed the Company's image.   In the four decades that TLC operated in central Ohio, it developed passionate collectors of its products and a cult following across the midwestern United States and beyond. Devoted followers revered the Longaberger family as the ideal American family, and TLC as a shining example of the "Great American Dream" fulfilled and a true "Made in America" brand.   By ostracizing Tami Longaberger, and more or less forcing her out of the Company that her family spent decades building, the Rochon Defendants eroded much of TLC's remaining goodwill.

**F. The Individual Defendants Failed to Institute, Monitor, and Enforce Adequate Internal Controls Even After Being Informed by Multiple Outside Audit Firms About the Company's Non-Compliant Financial Reporting.**

78.    The length, breadth, and depth of the Company's financial reporting problems confirms that the Company's internal controls were in disarray since at least 2013.   The Company's numerous and material financial reporting deficiencies were highlighted in its SEC

---

[7] For the Court's ease of reference, the relevant disputes include:

- *Tamala Longaberger v. CVSL, Inc., and Agel Enterprises Inc., and The Longaberger Company*, No. 15CV007013, Court of Common Pleas of Franklin County, Ohio (the "Ohio State Litigation");
- *Tamala Longaberger v. CVSL and the Longaberger Company*, American Arbitration Association No. 01-15-0004-6582 (the "Arbitration Proceeding"); and
- *JRJR33, Inc. dba JRJR Networks v. Tamala Longaberger, Individually and as Trustee under the Tamala L. Longaberger Revocable Trust*, No. DC-16-12594, 191st District Court, Dallas County, Texas (the "Dallas County Litigation").

filings as well as in internal communications between the Individual Defendants and the Company's outside auditors.

79. Beginning at the fiscal year ending December 31, 2015, the Company disclosed very significant issues with their internal controls and procedures. Identified as "material weaknesses," these are "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis." Such material weaknesses rendered the Company's internal controls and procedures ineffective.

80. The material weaknesses included:

i. <u>Overall Control Environment</u>: The Company had failed to maintain an effective control environment to provide reasonable assurance regarding achievement of objectives relating to operations, reporting and compliance. The Company had not complied with the requirement of the 2013 COSO Framework.

j. <u>Sufficient Accounting Personnel</u>: The Company had failed to maintain sufficient accounting personnel with the appropriate level of knowledge, experience and training commensurate with maintaining an effective control environment to meet the financial reporting requirements of a publicly traded company with international operations. The result of the lack of sufficient accounting personnel led to the following issues related to internal control over financial reporting: (i) Management estimates were not performed with the structure and rigor necessary to result in quality estimate that need for

fairly presented financial information; (ii) Management missed a required Form 8-K/A filing requirement related to a key acquisition. Subsequently, the filing was made 8 months later; (iii) Management made significant adjustments for material errors resulting from the review of the quarterly financial statements; (iv) Management made significant adjustments for material errors resulting from the audit of the annual financial statements; (v) Management made significant disclosure remediation and adjustments to the financial statements resulting from the quarterly review and annual audits; (vi) the Company and its subsidiaries incurred substantial delays in completing its audit; and (vii) the Company and its subsidiaries incurred breaches to covenants to its debt agreements due to the delays in missing its filing requirements.

k. _Consolidation Process_. The Company failed to institute effective controls to ensure the consolidation of all its subsidiaries was performed correctly. The consolidation was performed and reviewed by one employee. There were no controls to ensure all financial data of the subsidiaries were being compiled correctly, no review to ensure the employee was consolidating correctly and no controls to ensure all accounts are being appropriately converted and consolidated in the financial statements.

l. _Account Reconciliation_. The Company failed to maintain effective controls over the reconciliation of many of its accounts and the timely preparation and review of the financial statements or information. This resulted in a significant amount of reconciliations being performed as part of

the audit process. These reconciliations resulted in significant audit adjustments. Additionally, there was no formal review and approval of reconciliations performed by the accounting personnel.

m. <u>Deferred Revenue and Revenue</u>.  The Company failed to maintain control over its recording of deferred revenue and revenue in its sales process. This resulted in significant adjustments to the financial statements.

n. <u>Inventory Management</u>.  Certain Company affiliates accepted inventory upon the shipment of products (FOB Shipping Point). However, the Company failed to account for the receipt of inventory until it had been received. Accordingly, the Company did not maintain appropriate controls around its inventory management system.

o. <u>Journal Entry Support</u>.  The Company failed to maintain effective controls over the approval, recording and retention of journal entries and their supporting detail. The Company failed to maintain effective monitoring controls to ensure that journal entries were being properly prepared with sufficient supporting documentation or were reviewed and approved to ensure accuracy and completeness of the journal entries.

p. <u>Complex Accounting Issues</u>.  The Company failed to design an effective control environment to address complex accounting issues. The lack of qualified accounting personnel led to deficiencies in identifying complex accounting issues resulting in material adjustments to the financial statement in both the quarterly and year-end filings.

q. <u>Segregation of Duties</u>. The Company failed to maintain appropriate segregation of duties throughout the internal control over financial reporting process. The Company had numerous instances where review and approval was performed by the same employee negating any monitoring or approval controls.

r. <u>IT System Conversion Controls</u>. The Company did not develop a process to appropriately control the enterprise resource planning (ERP) system in the conversion of its subsidiaries.

s. <u>IT Control Environment</u>. The Company failed to maintain the appropriate level of controls over the ability to access its ERP systems. The lack of control resulted in the inappropriate approval of journal entries, inappropriate approval of expenditures, and inappropriate access to the general ledger.

81. While the Company did pay lip service to remediation initiatives, the follow-up did not amount to actual remediation, as much as it amounted to a blame-game. Namely, the Individual Defendants blamed the problems with their internal controls on the acquisition of various companies with outdated or otherwise insufficient systems to meet the reporting standards for public companies.

82. The Individual Defendants had actual notice of these serious control failures, yet the problems continued, despite statements that the Company was acting to rectify them. These same material weaknesses are disclosed in all 10-K and 10-Q filings from and after the fiscal year ending December 2015. In the midst of these ongoing problems, the Company went through three independent audit firms. With each change, the Company struggled more and

more to keep up with SEC filing deadlines to the point where the 2016 10-K did not get filed until October 2017. The quarterly reports for 2017 were not filed at all.

83. In the face of mounting evidence that strong remedial steps were required, the Individual Defendants permitted the situation to reach crisis point before acting, at which point it was too late. The Company's SEC filing delinquencies meant it could not raise capital through equity financing, and it was in default on its debt covenants with Dominion Capital LLC, from whom it had taken out a $4 million senior secured convertible note on November 20, 2015. There were also insufficient cash resources to meet operational needs.

84. The Individual Defendants knowingly failed to cure material weaknesses even after auditors confronted them with evidence of serious accounting improprieties, including: (i) reimbursement of the Rochon Defendants' personal travel expenses; (ii) payment of legal fees and other invoices on behalf of Richmont Holdings and other affiliates; (iii) contradictions between accounting practices described in SEC filings versus the Company's actual practice as to its handling of a $1 million payable to Rochon; (iv) manipulation of journal entries for commission expense versus consulting expense for business operations in Russia in order to avoid oversight from the Russian taxing authority; (v) complete absence of controls on the Company's IT functions as it pertained to accounting journal entries and financial statements, subjecting the Company to unreasonable risk of harm; (vi) lack of comprehension throughout the entire management and legal team as to public company accounting and disclosure requirements; (vii) expectation that auditors should clean up mistakes of CFO; (viii) employee expense reimbursement paid out of operating accounts of subsidiaries that did not employ that employee; (ix) falsifying an audit report with adverse opinion on "internal controls over financial reporting" with an unqualified opinion and adding auditor's name without consent; (x) refusing to comply

with audit firm's mandate that the Company cure material control weaknesses in violation of SEC requirements as a condition to future audit work; and (xi) unsupported journal entries of between $251,000 and $2.8 million that made it impossible for auditors to reconcile.

85.     The Individual Defendants responded to these internal control deficiencies by instituting a "paper" compliance program.   Specifically, the Company published a comprehensive Code of Business Conduct and Ethics, which included standards for the accuracy of books, records, and periodic reports.   The Company also named Defendant William H. Randall as Chairman of the Audit Committee, where he was designated as the "audit committee financial expert," as defined in applicable SEC rules.   While Randall's experience in the direct selling industry at the executive level was extensive and his Harvard MBA was impressive, Randall was not prepared to take on the role as "audit committee financial expert" for the Company given its financial compliance weaknesses and international accounting complexities. These measures may have appeared strong on paper but were wholly ineffective at addressing the ongoing problems, because the Company did not have enough adequately trained staff to audit, document, analyze and institute the Company's compliance program.

86.     The Individual Defendants possessed knowledge of these facts, yet for many months failed to address them while still paying exorbitant fees and reimbursements to Richmont Holdings, the closely held company that the Individual Defendants had described in public filings as a necessary advisory partner for the Company's M&A, accounting, tax, and legal matters.   The only conclusion from the audit work was that the Individual Defendants were fully informed about a laundry list of material weaknesses in the Company's control procedures, and that Richmont Holdings had failed to provide any guidance and oversight to prevent those deficiencies. Yet, the Individual Defendants continued the wrongful course of conduct by

diverting funds from legitimate and well-advised business applications that could have remedied the issues, and instead, continued to pay Richmont Holdings substantial fees and expenses.

**G. The Rochon Defendants Forced the Company to Take on Oppressive Debt and Failed to Fund the Company's Cash Shortfalls in Violation of an Agreement to do so.**

87.    By late 2017, the Company was in a freefall.  It had missed SEC filing deadlines, was under the threat of delisting, was unable to raise additional capital, had defaulted on the loan from a senior secured lender, and there was insufficient cashflow to continue operations.  These circumstances were the direct result of the Individual Defendants' governance failures.

88.    In response, the Individual Defendants assured the Company's shareholders and creditors that operations would be able to continue due to a Funding Request Agreement that the Company entered into on October 18, 2017 with Rochon Capital Partners to provide short term funding of cash shortages arising in the ordinary course of business through October 31, 2018. The Company's auditors fully relied on this Funding Request Agreement to conclude that the Company would be able to continue as a going concern through October 2018.  Specifically, the audit opinion relied on the representation that Rochon and Rochon Capital Partners had approximately $10 million of liquid funds available to support the Company's ongoing operations.

89.    But instead of requesting funds on the Funding Request Agreement, the Rochon Defendants continued to breach their fiduciary duties by committing the Company to "death spiral financing" with JGB Collateral, LLC ("JGB"), thereby digging the Company deeper into debt and further diluting the value of its shares.

90.    "Death spiral" loans, also referred to as vulture capitalism, PIPES, toxic convertibles, or toxic warrants are a type of private investment in public equity whereby the

investor extends a loan to the company in exchange for convertible debt. A typical death spiral loan does not state a predetermined number of shares, but instead allows for a flexible conversion rate which is some fractional percentage of the market rate at the time of conversion. Thus, the lower the price, the more shares are necessary to be issued at the conversion. This opens the door for the investor to benefit by manipulating the price downward by shorting the stock. The conversion then causes a dilution of the stock, driving down the price in a death spiral.

91.     In JGB's case, the $5 million loan with the Company, executed on or about October 19, 2017, contemplated that it would be able to earn outsized returns by getting paid in JRjr33 shares at the discounted price of 80% of its market price. Importantly, the JGB debt documents specifically rely on the Rochon Capital Partners' funding agreement as evidence of the Company's financial wherewithal and ability to operate as going concern, without which the loan would not have been made.

92.     Within a month after entering into the Funding Request Agreement, however, it became clear from internal Company communications from Rochon that it was never his intention for Rochon Capital Partners to fund cash shortages, and the Rochon Defendants began planning for the Company to be delisted and "go dark."

93.     By the following April 2018, the Company had defaulted on the JGB loan, and repayment was accelerated. Obviously, the Company did not have sufficient cash to repay JGB. Not surprisingly, Rochon, who stood on both sides of the transaction between the Company and Rochon Capital Partners, failed to enforce the Funding Request Agreement and cover the cash shortfall. JRjr33 and TLC filed their bankruptcy cases a couple of months later.

94.     The Rochon Defendants actively misled the Board, auditors, creditors and shareholders concerning the Company's ability to continue to operate as a going concern by executing the Funding Request Agreement on behalf of Rochon Capital Partners when they never intended to follow through on the promise to fund cash shortfalls.  But for this material misrepresentation, the oppressive JGB loan would not have been consummated and the bankruptcy estate would not now be subjected to a secured claim of $5.3 million.

**H. The Corporate Culture of Self-Dealing Carried Over to Bishop and his Company, ActiTech, L.P.**

95.     In May 2016, Defendant Bishop used his influence as the Company's board member to induce Agel – a major operating unit of the Company and a wholly-owned subsidiary – to enter into a letter agreement (the "Letter Agreement") with Bishop's company ActiTech, L.P. ("ActiTech"), which ultimately led to Bishop's effort to extract approximately $1.9 million in usurious fees and interest to the detriment of the Company.

96.     Agel was the primary player in the Company's nutritional and wellness division. Agel utilized the production capabilities of ActiTech's 600,000 square foot manufacturing facility in Sherman, Texas, to produce products to sell globally.  Agel paid ActiTech for product purchased during 2015 and 2014 totaling approximately $1.4 million and $286,000, respectively.

97.     Bishop became a member of the Company's Board on December 3, 2012.  He was actively involved in managing the Company's affairs, served on its Audit Committee in 2014, and, as part of that involvement, exercised authority as Agel's Chairman and CEO at one point.  Bishop also served as President of ActiTech, a full-service third-party manufacturer of items such as creams, hair products, OTC drugs, certified organic food and personal care products, energizing and relaxing drinks, and owner of a decontamination process for herbs and other products.

98.     Bishop leveraged his position on the Board, along with his insider knowledge that the Company and Agel had no alternative source immediately available to manufacture Agel's product line.  On or about May 31, 2016, ActiTech sent the Letter Agreement to Rochon, Jr., wherein a floating credit limit was provided so that payments to Actitech would be based on Agel's cash flow, not on a timing or days since shipping product.   In addition to the terms for supply, the Letter Agreement provided for the payment of "fees" based upon a stipulated calculation.

99.     Rochon, Jr. executed the Letter Agreement on behalf of the Company, but failed to obtain approval of the majority of the Board's disinterested directors.  Quickly thereafter, the business relationship between the Company and ActiTech deteriorated and shipments to Agel stopped.   In November and December 2016, Agel paid ActiTech $125,000 and $50,000 for additional goods, but ActiTech simply pocketed the money and, with the exception of a small shipment of less than $10,000 in goods in January 2017, never shipped Agel any products for that purchase or any previous purchase.

100.     For 2016, Agel paid approximately $1 million for goods from ActiTech, but carried a trade payable on its books to ActiTech in the amount of $3.3 million.  Of this amount, approximately $1.9 million was usurious fees for penalties and interest as a result of untimely payments throughout the year (the "Finance Charges").  Bishop, who served on the Company's Board and was involved in Agel's business, knew or should have known that the Finance Charges were neither fair to the Company nor financially sustainable in light of the Company's financial condition, considering it had reported net losses of almost $35 million on its Consolidated Statement of Operations for year-end 2016.

101.    In early 2017, there were settlement efforts to resolve the conflict between Bishop and the Company, but between the Rochon Defendants' dysfunctional management and Bishop's self-interested motivations, those efforts were, unsurprisingly, unsuccessful.  The Company thus maintained the additional $1.9 million in usurious fees and interests on its balance sheet.

102.    On October 31, 2017, Bishop resigned from the Board and threatened litigation against JRjr33 for non-payment.  His resignation letter also states that the draft submission to the SEC is not accurate.

## VII.    CONDITIONS PRECEDENT

103.    All conditions precedent to bring this suit have been performed or have occurred. Specifically, the Trustee brings this suit based on reasonable diligence in the circumstances of the Bankruptcy Case and taking into account Defendants' known or reasonably knowable affirmative defenses, including those under Section 547(c).

104.    During the course of this proceeding, Trustee may learn (through discovery or otherwise) of additional actionable conduct and/or avoidable transfers made to Richmont Holdings or Individual Defendants during the 1-Year Insider Preference Period or Two-Year Fraudulent Transfers period.  Likewise, the Trustee may learn additional information concerning Defendants' affirmative defenses.  It is Trustee's intention to avoid and recover all preferential and fraudulent transfers made by JRjr33 and TLC of any interest of the Debtors in property and to or for the benefit of Defendants or any other transferee.  Trustee reserves his right to amend this original Complaint to include: (i) further information regarding the avoidable payments, (ii) additional avoidable payment, (iii) modifications of and/or revision to Defendants' names, (iv) additional defendants, and/or (v) additional causes of action (i.e., but not exclusively, 11 U.S.C. § 542, § 544, § 545, § 548 and § 549) (collectively, the "Amendments"), that may become

known to Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

## VIII.   CAUSES OF ACTION

### A.  Count 1 – Breach of Fiduciary Duties Against Each Individual Defendant.

105.    The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

106.    Each of the Individual Defendants owed fiduciary duties to the Company as officers and/or directors.  Each of the Individual Defendants breached his or her duty of loyalty, candor and good faith to the Company by putting his or her own pecuniary interests above those of the Company.

107.    Each of the Individual Defendants utterly failed to implement any meaningful or effective compliance controls regarding the Company's accounting and financial reporting practices, even after they were informed of material weaknesses.  Each of the Individual Defendants consciously failed to monitor and enforce the Company's published ethics and compliance program.  Considering the nature and risks associated with the Company's business, in that their acquisition targets were already troubled and under-performing businesses that did not have the appropriate compliance infrastructure necessary for a public company, the Individual Defendants abdicated their fiduciary obligations by knowingly allowing the Company to ignore the necessary hiring, training, and separation of duties for staff to audit, document, analyze and institute the Company's compliance program.

108.    Individual Defendants are also liable for failing to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to: (a) monitor and prevent the Company's officers, directors and employees from failing to comply with all applicable legal

obligations and requirements; (b) monitor and prevent the Company's officers, directors and employees from engaging in illegal and/or fraudulent financial reporting; (c) remain informed as to the Company's internal controls and, upon receipt of notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and (d) promote a corporate climate that emphasized compliance with securities laws instead of the systemic violation of applicable legal requirements in the pursuit of personal gain.

109. Individual Defendants abused the trust imposed on them by virtue of their positions and breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight. As a result of their sustained and systematic failure to exercise oversight, Individual Defendants caused or allowed the Company's business to be conducted in violation of legal financial reporting requirements and regulations known to them, including the standards promulgated by Sarbanes-Oxley and the Foreign Corrupt Practices Act.

110. The Individual Defendants participated in or had knowledge of the Company's improper accounting and financial reporting activities, and still diverted cash to Richmont Holdings for the personal enrichment of the Rochon Defendants instead of investing in a robust compliance program. Each of the Individual Defendants permitted and/or authorized the Company to become exposed on a risky death spiral loan, thereby increasing the Company's secured debt by over $5 million, based on the sham assurance from Rochon Capital Partners to cover the Company's cash shortfalls.

111. Bishop leveraged his authority as a member of the Company's Board and as owner of a supplier to one of the Company's largest business segments to impose contractual

terms that were unfairly oppressive to the Company, and thereby extract a personal financial benefit to the detriment of the Company.

112.    By their acts and omissions alleged herein, Individual Defendants, and each of them, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the best interest of the Company, and its shareholders and creditors.

113.    The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Individual Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of the Company, and its shareholders and creditors. Defendants made the decisions subject to this action for their own pecuniary gain.  As a result of the foregoing, the Defendants have participated in harming the Company and have breached fiduciary duties owed to the Company.  Furthermore, the Individual Defendants knowingly aided, encouraged, cooperated, and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

114.    As a result of the Individual Defendants' wrongful conduct, the Company suffered irreparable economic losses that forced it into bankruptcy where creditors have filed proofs of claim against JRjr33, Inc. in the amount of $25,067,334.58 and against The Longaberger Company in the amount of $18,662,959.27.

**B.  Count 2 – Corporate Waste Against Each Individual Defendant.**

115.    The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders and creditors, the Individual Defendants caused the

Company to waste valuable corporate assets and to incur many millions of dollars in audit fees for public accounting firms to attempt to rehabilitate the Company's accounting and financial reporting practices. All the while, the Individual Defendants never seriously considered implementing the rehabilitative measures necessary to right the ship.

117. The Individual Defendants further caused the Company to waste additional corporate assets on management fees and reimbursement of personal expenses payable to Richmont Holdings in amounts that far exceeded the value that Richmont Holdings provided to the Company.

118. The Rochon Defendants also wasted corporate assets by obligating the Company on oppressive debt on unfavorable terms instead of enforcing a Funding Request Agreement with Rochon Capital Partners.

119. But for the Individual Defendants' conduct, including their failure to ensure appropriate financial reporting and compliance practices, the Company would have been able to timely file SEC reports making alternative forms of capital fundraising available, with more favorable terms than the "death spiral" financing offered by JGB.

120. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company for the economic losses attributable to these wrongful actions in an amount to be determined according to proof at the time of trial.

**C. Count 3 – Unjust Enrichment Against Each Individual Defendant.**

121. The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

122. The Rochon Defendants derived compensation, fees and other benefits from the Company, both directly in the form of salaries and indirectly in the form of management fees and

personal expenses reimbursed through Richmont Holdings, as well as the release of financial responsibility from the Rochon Defendants' refusal to enforce the Funding Request Agreement with Rochon Capital Partners. Bishop derived compensation in the form of Board fees and overly favorable contract terms and payments to his company, ActiTech, derived from his less than arms-length dealings with the Company and its Agel business.

123.    The Individual Defendants profited by engaging in the wrongful conduct set forth above. These benefits should not be held or retained by the Individual Defendants and should be disgorged back to the Trustee for the benefit of the estate and its creditors. Individual Defendants' enrichment is directly and causally related to the detriment of the Company, and these benefits were accepted by Individual Defendants under such circumstances that it would be inequitable for them to be retained without payment.

124.    As alleged above, the Individual Defendants breached their fiduciary duties and/or abused their positions of control at the Company and therefore the Individual Defendants are not justified in retaining the benefits conferred upon them.

**D.  Count 4 – Abuse of Control Against Rochon Defendants.**

125.    The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

126.    The Rochon Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

127.    As a direct and proximate result of the Rochon Defendants' abuse of control, the Company suffered loss of asset value, sharp increase in liabilities, and insurmountable economic damages that left it unable to operate as a going concern. As a result of the misconduct alleged

herein, the Rochon Defendants are each liable to the Trustee for the economic losses attributable to these wrongful actions in an amount to be determined according to proof at the time of trial.

**E. Count 5 – Gross Mismanagement Against Rochon Defendants.**

128. The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129. By their actions alleged herein, the Rochon Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and compliance of the Company in a manner consistent with the operations of a publicly-held corporation. The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Rochon Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of the Company, and it shareholders and creditors. The actions of the Rochon Defendants grossly deviated from the standard of care that prudent managers of public companies would observe in light of the substantial risk of significant harm that can occur due to systematic oversight and control deficiencies.

130. As a result of the misconduct alleged herein, the Rochon Defendants are each liable to the Trustee for the economic losses attributable to these wrongful actions in an amount to be determined according to proof at the time of trial.

**F. Count 6 – Avoidance and Recovery of 1-Year Insider Preferences Against Richmont Holdings and Rochon Defendants Pursuant to 11 U.S.C. §§ 544, 547(b) and 550(a), and Applicable State Fraudulent Transfer Law (Tex. Bus. & Com. Code §§ 24.006(b), and 24.008.**

131. The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.     Richmont Holdings and the Rochon Defendants qualify as "insiders" of JRjr33 and TLC due to their positions of management and control.

133.     Between June 29, 2017 and the Petition Date (the "Insider Preference Period"), Richmont Holdings received transfers from the Company as itemized in Exhibit A, attached hereto and incorporated herein by reference, in the total amount of $1,538,250.15 (the "Insider Preference Transfers").

134.     These payments made during the Insider Preference Period were to Richmont Holdings, and all or a portion thereof were made for the benefit of Rochon, Rochon, Jr., and/or Hafer.

135.     Each of the Insider Preference Transfers was made to or for the benefit of a "creditor."  Richmont Holdings was a creditor by virtue of the Reimbursement of Services Agreement.  The Rochon Defendants were "creditors" by virtue of their employment relationship with the Debtors.

136.     Each of the Insider Preference Transfers was made on account of an antecedent "debt" owed by JRjr33 and/or TLC before such Insider Preference Transfer was made.

137.     Each of the Insider Preference Transfers was made while JRjr33 and TLC were insolvent.

138.     Each transfer was made to an insider of JRjr33 and TLC, within one year of the Petition Date.

139.     Richmont Holdings and the Rochon Defendants received more than they would have were this case under Chapter 7 of the Bankruptcy Code, the Insider Preference Transfers not been made, and Richmont Holdings and the Rochon Defendants received payments on their debts to the extent provided by the provisions the Bankruptcy Code.

140.    Richmont Holdings is the initial transferee of the Insider Preference Transfers. The Rochon Defendants are either the parties for whose benefit the transfers were made or an immediate or mediate transferee of the Insider Preference Transfers.

141.    As a result of these circumstances, the Insider Preference Transfers should be avoided under 11 U.S.C. §§ 544, 547, and the Trustee entitled to recover the amount of the Insider Preference Transfers against Richmont Holdings and the Rochon Defendants pursuant to 11 U.S.C. § 550(a).

**G. Count 7 – Avoidance and Recovery of 2-Year Fraudulent Transfers Against Richmont Holdings and Rochon Defendants Pursuant to 11 U.S.C. §§ 544, 548(a)(1)(B) and 550(a), and Applicable State Fraudulent Transfer Law[8] (Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a), and 24.008).**

142.    The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143.    Between June 29, 2016 and the Petition Date (the "Fraudulent Transfer Period"), Richmont Holdings received transfers from the Company as itemized in <u>Exhibit B</u>, attached hereto and incorporated herein by reference, in the total amount of $2,883,067.36, and $271,112.11 in additional transfers from the Company were made directly to Rochon (the "Fraudulent Transfers").

144.    These payments made during the Fraudulent Transfer Period were to Richmont Holdings and Rochon, and all or a portion thereof were made for the benefit of Rochon, Rochon, Jr., and/or Hafer.

---

[8] Pursuant to Tex. Bus. & Com. Code § 24.010(2), the Trustee reserves the right to enhance the Fraudulent Transfer Claim to the four-year lookback period.

145. These payments made during the Fraudulent Transfer Period to Richmont Holdings, as itemized on Exhibit B, and the additional transfers to Rochon should be avoided as fraudulent transfers.

146. Because of (i) the breaches of fiduciary duty detailed hereinabove (ii) the general failure to discharge their responsibilities described herein, and (iii) the large sums involved for non-business expenses, the Company received less than reasonably equivalent value for the Fraudulent Transfers.

147. The Company was insolvent throughout 2016 as evidenced by its consolidated balance sheet filed with the SEC, which show that the Company's liabilities exceed its assets by $16,210,000.00. Because there was no improvement of financial condition from 2016 to the Petition Date, the Company is presumed to have been insolvent continuously throughout that period.

148. Throughout the Fraudulent Transfer Period, the Company was also unable to pay its debts as they became due.

149. Throughout the Fraudulent Transfer Period, the Company was engaged in business or a transaction, or was about to engaged in business or a transaction, for which any property remaining with the Company was an unreasonably small capital.

150. Throughout the Fraudulent Transfer Period, the Company intended to incur, or believed it would incur, obligations, notwithstanding the fact that the obligations would be beyond its ability to pay as they matured.

151. The Company made the Fraudulent Transfers for the benefit of the Rochon Defendants, as insiders, as consideration for their employment and not in the ordinary course of business.

152.     Richmont Holdings (as to amounts listed in Exhibit B) and Rochon (as to an additional $271,112.11) are the initial transferees of the Fraudulent Transfers. The Rochon Defendants are either the parties for whose benefit the transfers were made or an immediate or mediate transferee of the Fraudulent Transfers.

153.     As a result of these circumstances, the Fraudulent Transfers should be avoided under 11 U.S.C. §§ 544, 548(a)(1)(B), and the Trustee entitled to recover the amount of the Fraudulent Transfers against Richmont Holdings and the Rochon Defendants pursuant to 11 U.S.C. § 550(a).

**H.  Count 8 – Disallowance of All Claims Pursuant to 11 U.S.C. § 502(d).**

154.     The Trustee incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.     Defendants are transferees of transfers avoidable under sections 544, 547, and/or 548 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

156.     Defendants have not paid the amount of the Insider Preference Transfers and/or the Fraudulent Transfers, or turned over such property, for which Defendants are liable under 11 U.S.C. § 550.

157.     Pursuant to 11 U.S.C. § 502(d), any and all Claims of Defendants and/or their assignee, against the chapter 7 estates of JRjr33 or TLC or the Trustee must be disallowed until such time as Defendants pay to the Trustee an amount equal to the aggregate amount of the Insider Preference Transfers and/or the Fraudulent Transfers, plus interest thereon and costs.

## IX.    PRAYER

WHEREFORE, the Trustee respectfully requests that this Court enter judgment against the Defendants, and award the Trustee: (i) economic damages suffered by the bankruptcy estates of JRjr33 and TLC for Defendants' negligence, gross negligence, and breaches of fiduciary duty; (ii) exemplary damages on any and all causes of action permitting such damages; (iii) avoidance and recovery on Chapter 5 claims; (iv) interest at the maximum legal rate; (v) costs of court, and fees and expenses as permitted; and (vi) and such other and further relief as this Court may deem just and proper.

Dated: June 26, 2020.

Respectfully submitted,

ROCHELLE McCULLOUGH, LLP

By: */s/ Kathryn G. Reid*
    Kevin D. McCullough
    State Bar No.  00788005
    Kathryn G. Reid
    State Bar No.  24068126
    Shannon S. Thomas
    State Bar No. 24088442
    325 N. St. Paul Street, Suite 4500
    Dallas, Texas 75201
    Telephone:  214-953-0182
    Facsimile:  214-953-0185
    Email: kdm@romclaw.com
    Email: kreid@romclaw.com
    Email: sthomas@romclaw.com

    SPECIAL LITIGATION COUNSEL
    FOR ROBERT YAQUINTO, JR.,
    CHAPTER 7 TRUSTEE